No. 18-30255

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
————————————

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE,

v.

DIMARZIO SWADE SANCHEZ,
DEFENDANT-APPELLANT.
————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
D.C. NO. CR 16-82-BLG-SPW
————————————

ANSWERING BRIEF OF THE UNITED STATES
————————————

KURT ALME
United States Attorney

LORI HARPER SUEK
JEANNE TORSKE
Assistant U.S. Attorneys
District of Montana
James F. Battin U.S. Courthouse
2601 Second Avenue North
Suite 3200
Billings, MT 59101
Telephone: (406) 247-4630

Attorneys for Appellee

# TABLE OF CONTENTS

Table of Contents ................................................................... i

Table of Authorities ............................................................ iii

Introduction ......................................................................... 1

Statement of Jurisdiction ....................................................... 3

Statement of the Issues ......................................................... 3

Statement of the Case ........................................................... 3

Statement Regarding Oral Argument ...................................... 4

Statement of Facts ................................................................ 4

    I.     After agreeing to drive Jane home, Dimarzio Sanchez
          and his co-defendants beat, strangled, burned alive, and
          left Jane lying naked along a dirt road. ................................ 4

    II.    Sanchez, while in custody on an unrelated tribal charge,
          agreed to speak with law enforcement after consulting
          with his tribal lay advocate ............................................... 6

    III.   Prior to trial, Sanchez requested a supplemental jury
          instruction advising the jury that he was subject to a
          mandatory minimum life sentence. ................................... 12

    IV.   The day after trial an iPhone containing potentially
          inculpatory and/or impeachment evidence was found. ....... 12

Summary of Argument ........................................................ 17

Argument ........................................................................... 18

    I.    A.   The district court, well within its discretion, denied
          Sanchez's motion for retrial alleging a *Brady* violation
          given that Sanchez filed a timely new trial motion based
          upon the new evidence, the only remedy available to him
          post-trial ......................................................................... 18

> B.     The district court, acting well within its discretion, denied Sanchez's motion for a new trial based on newly discovered evidence that was merely impeaching. ..............................21

II.    The district court properly denied Sanchez's motion to suppress because Sanchez did not unambiguously request an attorney; because he voluntarily, knowingly, and intelligently waived his *Miranda* rights; and because he had no Sixth Amendment right to counsel. ........................................25

> A.    The district court properly concluded Sanchez's request for his tribal lay advocate was not an unambiguous request for an attorney. ..................................................25

> B.    The district court properly concluded Sanchez knowingly and intelligently waived his *Miranda* rights and voluntarily agreed to speak with law enforcement.......................27

> C.    The district court properly concluded that Sanchez's Sixth Amendment right to counsel had not attached because a federal prosecution had not commenced. ............................29

III.   The district court did not abuse its discretion by refusing to instruct the jury that Sanchez faced a mandatory minimum life sentence. ........................................................30

Conclusion .....................................................................................32

Statement of Related Cases.................................................................33

Certificate of Compliance...................................................................34

Certificate of Service .......................................................................35

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Avila v. Los Angeles Police Dep't.*,
  758 F.3d 1096 (9th Cir. 2014) .................................................30

*Clark v. Murphy*,
  331 F.3d 1062 (9th Cir. 2009) .................................................10

*Davis v. United States*,
  512 U.S. 452 (1994).......................................................... 10, 25

*Derrick v. Peterson*,
  924 F.2d 813 (9th Cir. 1990) .................................................29

*Dickerson v. United States*,
  530 U.S. 428 (2000)...............................................................27

*Doody v. Schiro*,
  596 F.3d 620 (9th Cir. 2010) .................................................27

*Edwards v. Arizona*,
  451 U.S. 477 (1981)...............................................................25

*In re Masterson*,
  638 Fed. Appx. 320 (5th Cir. 2016)........................................19

*Kyles v. Whitley*,
  514 U.S. 419 (1995)...............................................................18

*Miranda v. Arizona*,
  384 U.S. 436 (1966)...............................................................25

*Moran v. Burbine*,
  475 U.S. 412 (1986)...............................................................28

*Oregon v. Elstad*,
  470 U.S. 298, (1985)...............................................................27

*Schneckloth v. Bustamante*,
    412 U.S. 218 (1973)......................................................................................27

*Shannon v. United States*,
    512 U.S. 573 (1994)........................................................................ 2, 12, 31

*Smith v. Roberts*,
    115 F.3d 818 (10th Cir. 1997) ......................................................19

*Strickler v. Greene*,
    527 U.S. 263 (1999).......................................................................... 18, 21

*United States v. Bautista-Avila*,
    6 F.3d 1360 (9th Cir. 1993) .........................................................29

*United States v. Bernard S.*,
    795 F.2d 749 (9th Cir. 1986) ........................................................29

*United States v. Berry*,
    624 F.3d 1031 (9th Cir. 2010) ......................................................21

*United States v. Charley*,
    396 F.3d 1074 (9th Cir. 2005) ......................................................29

*United States v. Crawford*,
    372 F.3d 1048 (9th Cir.2004) ......................................................27

*United States v. Glover*,
    596 F.2d 857 (9th Cir. 1979) ......................................................29

*United States v. Gonzales*,
    749 F.2d 1329 (9th Cir. 1984) ......................................................29

*United States v. Hanoum*,
    33 F.3d 1128 (9th Cir. 1994) ......................................................22

*United States v. Hinkson*,
    585 F.3d 1247 (9th Cir. 2009) ......................................................21

*United States v. Laureano-Salgado*,
   933 F.3d 20 (1st Cir. 2019)..............................................................................18

*United States v. Olano*,
   62 F.3d 1180 (9th Cir. 1995) ........................................................ 2, 12, 31

*United States v. Pimentel*,
   654 F.2d 538 (9th Cir. 1981) ................................................................ 21, 24

*United States v. Zapien*,
   861 F.3d 971 (9th Cir. 2017) ..........................................................................25

## Statutes

18 U.S.C. § 3231 ..............................................................................................3
18 U.S.C. §§ 1153(a) ......................................................................................12
28 U.S.C. § 1291 ..............................................................................................3

## Rules

Fed. R. App. P. 32(a)(7)(C) ..........................................................................34
Fed. R. Crim. P. 33 ........................................................................................21
Federal Rules of Appellate Procedure 34(a).................................................4

# INTRODUCTION

Dimarzio Swade Sanchez set a 28-year-old woman, Jane,[1] on fire and left her on the side of the road. Fourteen hours later, a rancher found her strangled, beaten, burned, but alive. She died in a burn unit 73 days later. A jury convicted Sanchez of first degree murder/aiding and abetting for his role in Jane's murder. Sanchez now appeals challenging the district court's denials of a motion for a new trial, a motion to suppress statements, and a motion for a supplemental jury instruction.

In his motion for a new trial, Sanchez claims that the United States violated *Brady*, and argues that new evidence discovered post-trial is critical impeachment evidence that, if presented to the jury, would result in his acquittal. The district court found that the United States complied with *Brady*, proven by the fact that Sanchez had the evidence in time to file a timely new trial motion based upon the newly discovered evidence, which was the only remedy available to him post-trial. The court then correctly determined that the newly discovered evidence did not exculpate Sanchez, nor make it more likely that a jury would have acquitted him had it heard the impeachment evidence.

---

[1] The victim will be referred to as "Jane" throughout this brief.

Sanchez's motion for suppression challenged statements he made to law enforcement. He argues that he invoked his right to an attorney by asking for his tribal lay advocate, that law enforcement deliberately ignored that request, and that law enforcement violated his Sixth Amendment right to counsel. The district court found that, even though Sanchez did not unambiguously ask for an attorney, law enforcement stopped the interview anyway, explained that the tribal lay advocate was not an attorney, and then honored his request and allowed him to consult with his tribal lay advocate prior to questioning. Sanchez, after consulting his tribal lay advocate, knowingly and intelligently waived his rights and voluntarily agreed to speak with law enforcement. And because Sanchez was not in federal custody at the time – he was being held on an unrelated tribal charge – the Sixth Amendment right to counsel did not apply.

Finally, Sanchez challenges the district court's refusal to give a supplemental jury instruction that would have told the jury he was subject to a mandatory minimum sentence of life imprisonment. As the district court noted, this argument is counter to well-established law. *See Shannon v. United States*, 512 U.S. 573, 579 (1994); *United States v. Olano*, 62 F.3d 1180, 1201 (9th Cir. 1995).

The district court should be affirmed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291. Final judgment was filed on December 26, 2018. ER 58. Sanchez filed a timely notice of appeal two days later on December 28, 2018. ER 1412.

## STATEMENT OF THE ISSUES

1A.    Whether the district court, well within its discretion, denied Sanchez's motion for a new trial by finding that there was no *Brady* violation?

1B.    Whether the district court, well within its discretion, denied Sanchez's motion for a new trial based on newly discovered evidence?

2.    Whether the district court correctly denied Sanchez's motion to suppress?

3.    Whether the district court, well within its discretion, denied Sanchez's request for a supplemental jury instruction?

## STATEMENT OF THE CASE

Dimarzio Swade Sanchez, along with Angelica Jo Whiteman and Frank James Sanchez, was indicted for first degree murder/aiding and abetting. ER 1133-1134. Following a four day trial, a jury found Dimarzio Sanchez guilty of first degree murder/aiding and abetting. ER 1212-1213. The district court imposed a life sentence. ER 58-64. Dimarzio Sanchez now appeals. ER 1412.

## STATEMENT REGARDING ORAL ARGUMENT

Under Federal Rules of Appellate Procedure 34(a), the United States advises the Court of its view that oral argument is unnecessary because the facts and legal arguments are adequately presented in the briefs and record.

## STATEMENT OF FACTS

**I.      After agreeing to drive Jane home, Dimarzio Sanchez and his co-defendants beat, strangled, burned alive, and left Jane lying naked along a dirt road.**

On April 16, 2016, following a long day of drinking and driving around the Northern Cheyenne Indian Reservation, Dimarzio Sanchez, Angelica Whiteman, Frank Sanchez, two minors[2], and another adult traveled to a nearby bar to purchase more alcohol.  ER 349-51 (J.T.F.), 366-69 (J.T.F.), 389-90 (S.F.B.), 392-95 (S.F.B.), 487 (Whiteman), 561-62 (Frank Sanchez).  While in the bar, Whiteman met the victim, Jane, who asked for a ride home to the neighboring Crow Indian Reservation.  ER 354 (J.T.F.), 396-97 (S.F.B.), 492-96 (Whiteman), 566, 568 (Frank Sanchez).  Whiteman agreed and brought Jane back to the car.  *Id.*

On the drive, Whiteman and Jane began to physically fight in the car. ER 356-57 (J.T.F.), 412 (S.F.B.), 499-500 (Whiteman), 624, 627 (S.F.B.), 807-

---

[2] S.F.B. and J.T.F.

4

09 (Frank Sanchez).  The fighting continued until Dimarzio Sanchez pulled the car onto a side road and everybody got out.  ER 357-59 (J.T.F.), 414-15 (S.F.B.), 499-500 (Whiteman), 626-27 (S.F.B.), 809-10 (Frank Sanchez).  Whiteman continued to beat Jane.  ER 360-61 (J.T.F.), 415 (S.F.B.), 501 (Whiteman), 810-11 (Frank Sanchez).  Jane was either stripped naked or forced to take off her clothes.  ER 359 (J.T.F.), 713-14 (Whiteman).  At this point, Dimarzio and Frank Sanchez told the minors to get back inside the car.  ER 359-60 (J.T.F.), 627-28 (S.F.B.).

Dimarzio Sanchez pulled out a bandana and told Whiteman that he would show her how to strangle Jane and then he strangled Jane with a bandana.  ER 361, 380-81 (J.T.F.), 418, 420 (S.F.B.), 506-07 (Whiteman).  He then told Whiteman that she had to "finish [Jane] off", and he and Frank Sanchez got back into the car.  ER 361 (J.T.F.), 507-08 (Whiteman).  Whiteman strangled Jane until she defecated and went limp.  ER 507-08 (Whiteman), 816 (Frank Sanchez).  Whiteman then came back to the car, crying, saying she'd killed Jane.  ER 361 (J.T.F.), 420 (S.F.B.), 508 (Whiteman).  Dimarzio and Frank Sanchez got out of the car to check and told Whiteman that she'd only "blacked her out."  ER 420 (S.F.B.), 509 (Whiteman).  Dimarzio Sanchez then popped the trunk and told Frank Sanchez to get the gas can.  ER 360 (J.T.F.), 509-10 (Whiteman), 817 (Frank Sanchez).

Frank Sanchez handed the gas can to Dimarzio Sanchez, then Dimarzio Sanchez doused Jane with gasoline and lit her on fire. ER 510 (Whiteman), 817 (Frank Sanchez). While the testimony differs as to when Whiteman and Frank Sanchez returned to the car, all of the witnesses agree that Dimarzio Sanchez did not get back into the car until after Jane was set on fire. ER 361 (J.T.F.), 422 (S.F.B.), 510 (Whiteman), 818 (Frank Sanchez). Both minors looked back and saw fire where Jane was lying. ER 362 (J.T.F.), 422 (S.F.B.)

Mid-afternoon the next day, a rancher stopped to relieve himself and saw Jane lying along the road, completely naked and covered in burns. ER 327-28. He covered her in a sleeping bag, gave her something to drink, and then contacted law enforcement. ER 328. Jane was rushed to a local emergency room and then life-flighted to a burn unit at the University of Utah. ER 778. She had severe burns over 40% of her body. ER 780. After 73 days and more than twenty life-saving procedures, Jane died due to complications from her burns. ER 783, 786, 793.

## II. Sanchez, while in custody on an unrelated tribal charge, agreed to speak with law enforcement after consulting with his tribal lay advocate.

Three days after Jane was found, Sanchez was arrested on an unrelated tribal charge. ER 2, 111. While at the tribal jail, agents interviewed Sanchez

about events related to Jane's burning.  ER 72, 153-90.  At the start of the

interview, the following exchange occurred.

| | |
|---|---|
| Sanchez: | Won't I get a lawyer in here? |
| Agent Dodd: | Do you have one? |
| Sanchez: | Yeah. |
| Agent Dodd: | Who is your lawyer? |
| Sanchez: | Joe Waters, bestest lawyer on the Lame Deer res. |
| Agent Dodd: | Okay.  Have you - - have you already spoken to Joe?  Does he know he's your lawyer? |
| Sanchez: | Yeah, he knows he's my lawyer. |

*　　*　　*

| | |
|---|---|
| Agent Dodd: | - - this? Okay. All right. So we make contact with Joe then? |
| Sanchez: | Yeah. |
| Agent Dodd: | Okay. |
| Agent Grinsell: | He's not a lawyer but, he's - - he's a lay advocate. |
| Agent Dodd: | He's a lay advocate for here? |
| Sanchez: | Yeah. |
| Agent Dodd: | So is Joe who you want? |
| Sanchez: | I don't know - - yeah. |

ER 116-18.  After Sanchez's request, the agents ended the interview and

contacted Joe Waters, Sanchez's tribal lay advocate, who came to the tribal jail.

ER 82-84, 123.

In the presence of Waters, Sanchez read his *Miranda* rights, including his right to counsel, and signed the acknowledgement form. ER 124-25. Waters also signed the form as a witness. ER 125. In the presence of Waters, Sanchez was interviewed about the events of April 16 and 17, 2016. ER 153-90.



SENSITIVE MATERIAL - SUBJECT TO L.R. CR 16.4

About an hour after the interview ended, the agents learned new details about the investigation and contacted Waters for permission to ask Sanchez some additional questions. ER 3, 190. Waters was unavailable, but he gave the agents permission to speak with Sanchez. ER 3-4, 191. The following exchange occurred:

| | |
|---|---|
| Agent Dodd: | Right? Just – okay. I went to go see Joe [Waters], your representative. |
| Sanchez: | Yep. |
| Agent Dodd: | Joe couldn't be here, so I asked permission to speak with you, and he said go ahead. And I have to legally be honest when I tell you that, because I cannot speak with you without his consent. |
| Sanchez: | Yeah. |

| Agent Dodd: | And Joe stated to go ahead and speak with you again. We had a follow-up question to ask you, but remember the same rights are still applicable. You have the right to remain silent, anything you say can and will be used against [you] in a court of law. **You have a right to an attorney, and to have him present here.** You can stop talking at any time. You came in here this time without any shackles or handcuffs; is that correct? |
| Sanchez: | Yeah. |
| Agent Dodd: | Okay. You're going to be free to leave this room, I'll escort you back over into the correction side, okay? If you want to stop taking. But having these – these rights in mind, will you agree to speak with us again? |
| Sanchez: | Yeah. |

ER 4, 191 (emphasis added).

Prior to trial, Sanchez filed a motion to suppress the statements he made to law enforcement.[3] ER 1135-37. Sanchez argued that he unambiguously requested an attorney and was denied that right when the agents honored his request and provided him with an opportunity to have his tribal lay advocate present. ER 1139-40. He also claimed that his statements were involuntary. ER 1140-46. Finally, he claimed that the interview was an adversarial proceeding and that his Sixth Amendment rights were violated because the

---

[3] Sanchez's statements were recorded and the transcript of both interviews is found at ER 108-203. Regarding the burning of Jane, Sanchez denied any involvement or knowledge and claimed that he dropped Jane off at a trailer on the Crow Indian Reservation and last saw her walking toward the trailer. ER 142-43, 147-49, 165, 176, 202.

agents were required to provide him with counsel.  ER 1146-47.  The court

denied the motion.  ER 1-10.

Taking on the threshold issue first, the district court found that Sanchez's

request for an attorney was not an unambiguous request.  ER 6.  The court

compared Sanchez's initial statement, "won't I get a lawyer," to statements

previously held by the United States Supreme Court and this Court to be

ambiguous, and found Sanchez's statement to be strikingly similar to those

statements.[4]  *Id.*  But understandably important to the Court, was the fact that

even though Sanchez's request for an attorney was ambiguous, the agents

stopped questioning him and asked him for the identity of his attorney.  *Id.*

That is when the agents learned that Sanchez was not requesting an attorney but

rather his tribal lay advocate, Joe Waters.  *Id.*  The agents told Sanchez that

Waters was not an attorney but Sanchez persisted in his request to speak with

Waters and the agents honored the request.  *Id.*  The court correctly held that no

reasonable officer could have understood Sanchez's request to be a request for

an attorney.  ER 6-7.

---

[4] *Davis v. United States*, 512 U.S. 452, 462 (1994) ("[m]aybe I should talk to a lawyer"); *Clark v. Murphy*, 331 F.3d 1062, 1070 (9th Cir. 2009) ("I think I would like to talk to a lawyer").

The court next addressed the voluntariness of Sanchez's statements. ER 7. Prior to questioning Sanchez, the agents provided Sanchez with a statement of rights and told him he could stop the interview and leave at any point. *Id.*; 124-125. When Sanchez asked to speak with Waters, the agents terminated the interview, located Waters, and asked his permission to talk with Sanchez even though they were under no legal obligation to terminate the interview. ER 7-8; 123-25. Considering the circumstances of the interviews, the court found that Sanchez's statements were voluntary. ER 7-8.

For some of the same reasons, the court found that Sanchez knowingly and intelligently waived his *Miranda* rights. ER 9. Sanchez waived his rights only after consulting with Waters, the person that he requested be made available to him. ER 9, 123-25. Additionally, the interviews were recorded so that the court had the benefit of hearing that Sanchez's responses to the agents were articulate. *Id.* Again, after considering the circumstances of the interviews, the court found that Sanchez knowingly and intelligently waived his *Miranda* rights. *Id.*

Finally, the court found that there was no violation of the Sixth Amendment right to counsel because Sanchez was not in federal custody when he was interviewed. *Id.*

### III. Prior to trial, Sanchez requested a supplemental jury instruction advising the jury that he was subject to a mandatory minimum life sentence.

About a month before trial, Sanchez filed a motion for a supplemental jury instruction. ER 1182. Sanchez's proposed instruction stated:

> The jury is advised that if a guilty verdict is returned on the sole count in the Indictment, First Degree Murder in in violation of 18 U.S.C. §§ 1153(a), 1111, and 2, he would be sentenced to a mandatory term of life imprisonment without the possibility of parole. The Court has no discretion to impose lesser term(s), no part may be suspended. Mandatory prison terms must be served. Parole has been abolished in the federal system.

ER 1185. The district court denied Sanchez's motion finding that it was contrary to well-established United States Supreme Court law, and law from this Court. ER 11-12.[5]

### IV. The day after trial an iPhone containing potentially inculpatory and/or impeachment evidence was found.

The day after trial, December 8, 2017, a young lady came to the office of the Bureau of Indian Affairs on the Northern Cheyenne Indian Reservation and showed her phone to a BIA law enforcement agent. ER 18, 1328. The phone contained a calendar note linked to April 16, 2016, the date Jane was burned, stating:

---

[5] *Shannon v. United States*, 512 U.S. 573, 579 (1994); *United States v. Olano*, 62 F.3d 1180, 1201 (9th Cir. 1995).

> I should have told them the truth about what I did. . Now I'm full
> of regret not of what happen but I told them what somewhat
> happen I was part of it.. I beat her in the car a bit I kicked her on
> the side of the head I helped find the gas can. I felt so alone when I
> found out they got caught.

ER 19, 1246 (typographical errors in original). The agent did not immediately recognize the significance of the note because he was not involved in either Sanchez's trial or the investigation into Jane's death. ER 19, 1333. He did take a photo of the note and advised the young lady not to delete it. ER 19, 328. A few days later, the agent showed the photo of the note to another BIA agent, who was involved in Sanchez's case and immediately recognized its significance. ER 19, 1319-20. At roughly the same time, an FBI agent, Aaron Christensen, received a text containing a screenshot of a Facebook post of the note and immediately informed the United States. ER 20, 1282-83.

Christensen recovered the phone and interviewed the young lady who had purchased the phone-second hand and brought the note to the BIA's attention. ER 20, 1304-05. Christensen then began to trace the history of the phone to determine who owned it at the time the calendar note was made. ER 20, 1283-86. Christensen reached a dead end. ER 20, 1286. Christensen also submitted the phone for forensic analysis. ER 20, 1286. About a month after trial, Christensen submitted his initial reports and forensic analysis to the United States. ER 20, 1371.

In mid-January, a third-party told defense counsel about the calendar note. ER 21, 1228-29. Defense counsel contacted the United States and learned that the FBI was investigating. ER 21, 1231. Defense counsel made two informal requests for discovery related to the iPhone, and the United States provided defense counsel with an email summary of the FBI's investigation. ER 21, 1248. In March, the United States turned over Christensen's reports, the forensic analysis, and phone. ER 21. Defense counsel had the phone forensically analyzed. ER 21, 1254-55.

Despite the iPhone's poor condition and lack of functionality. ER 1337-38, agents and investigators determined a calendar note was created approximately one month[6] after Jane's death, and modified six months later. ER 22, 1258, 1263-64. Agents and investigators were unable to determine who owned the phone when the calendar note was created or what the note originally said.[7] ER 22-23.

---

[6] The date and time associated with the creation and modification may not be accurate due to the phone's poor condition. ER 1339-41, ER 1343-44.

[7] Circumstantial evidence indicates that J.T.F., one of the minors present at Jane's death, may have owned the phone. The April 16, 2016 calendar note was created on June 22, 2016. ER 1260-62, 1338. J.T.F.'s possible ownership is linked to the content of a second calendar entry created on June 25, 2016, three days after the April 16, 2016 calendar note was created. ER 1263. The second calendar entry refers to "Theron's daughter." Id. "Theron" was J.T.F.'s boyfriend at the time. ER 1272-73. J.T.F. admitted that she engaged in text messaging with Theron's daughter's mother, and may have written the calendar

Based on this newly discovered evidence, Sanchez argued that he was entitled to a new trial because the United States withheld the phone evidence in violation of *Brady*. ER 11. He also argued a new trial was warranted because the phone evidence was newly discovered evidence that would make it more likely than not that he would have been acquitted of Jane's murder if the jury had heard the phone evidence. ER 11-12. And finally, Sanchez claimed that the United States destroyed the phone evidence. ER 12.

The district court first considered whether the United States had violated *Brady*. ER 24-31. The court found that although the evidence was merely impeaching not exculpatory, it was subject to disclosure. ER 28. Further, the court found that the United States disclosed the evidence in time for Sanchez to file a timely new trial motion, which was the only remedy available to him since the evidence was not discovered until after trial. ER 29-30. And, finally, the court found that Sanchez suffered no prejudice because he did, in fact, file a

---

event related to that, but she denies that she ever owned the blue iPhone. ER 1300-01

The temporal proximity of the two calendar events, in Sanchez's view, settles the question of who wrote the April 16, 2016 calendar note retrieved from the iPhone. The United States maintains that, because both calendar notes were modified on December 16, 2016, there is no way to know how the calendar notes read on June 22, 2016 and June 25, 2016, respectively, when created. ER 1339, 1341. Further, as explained by Sanchez's expert, entries on the iPhone's calendar could be made remotely. ER 22, 1262-63, 1272-73.

new trial motion based upon the newly discovered phone evidence.  ER 31.
The court found that the United States did not violate *Brady*.  *Id.*

Next, the court considered whether the newly discovered evidence entitled Sanchez to a new trial.  ER 20.  Sanchez's argument is based upon the assumption that the calendar note was written by J.T.F.  ER 23.  That assumption leads Sanchez to conclude the phone evidence constitutes impeachment evidence against J.T.F. so powerful that it would lead to Sanchez's acquittal.  ER 23.  Even if Sanchez was correct that J.T.F. authored the calendar note, the district court summed up why Sanchez was not entitled to a new trial.

> The impeachment evidence has no exculpatory connection and does not undermine critical evidence because Dimarzio's conviction does not hinge on [J.T.F.'s] credibility.  The case against Dimarzio was made by four eyewitnesses, and [J.T.F.'s] testimony was the least damning of the group. . . .  Discrediting [J.T.F.] would've only put a slight dent in the government's case against Dimarzio . . . .

ER 21.

The court found that the United States did not destroy the phone evidence.  ER 36.  "Neither the phone nor the note were lost or destroyed.  Both the government and Dimarzio have forensically analyzed the phone and harvested all the available information from it."  *Id.*

The court ultimately denied the motion for new trial.  ER 39.

# SUMMARY OF ARGUMENT

The district court did not abuse its discretion by denying Sanchez's motion for a new trial by finding that, because Sanchez had the new evidence in time to file a timely new trial motion, his only available post-trial remedy, the United States did not violate *Brady*.

The court also did not abuse its discretion by denying Sanchez's motion for a new trial based on newly discovered evidence because the iPhone evidence was merely impeaching and, if introduced at trial, would not have resulted in acquittal.

Additionally, the district court correctly denied Sanchez's motion to suppress because (1) he did not make an unambiguous request for an attorney when he requested his tribal lay advocate, (2) he voluntarily, knowingly, and intelligently waived his *Miranda* rights in the presence of his tribal lay advocate, and (3) his right to counsel under the Sixth Amendment had not yet attached as the interviews occurred while he was in custody on an unrelated tribal charge.

Finally, the district court did not abuse its discretion by denying Sanchez's motion for a supplemental jury instruction informing the jury of the mandatory minimum sentence, a request contrary to settled law.

## ARGUMENT

**I.** **A.  The district court, well within its discretion, denied Sanchez's motion for retrial alleging a *Brady* violation given that Sanchez filed a timely new trial motion based upon the new evidence, the only remedy available to him post-trial.**

**Standard of Review:**  A district court's denial of a new trial motion based on an alleged *Brady* violation is reviewed for an abuse of discretion. *United States v. Laureano-Salgado*, 933 F.3d 20, 29 (1st Cir. 2019) (reviewing for an abuse of discretion a *Brady* allegation related to evidence discovered post-trial).

**Argument:**  The iPhone evidence was not discovered until the day after trial, which means that post-trial *Brady* law, rather than the more typical pre-trial *Brady* law applies.  In the usual case alleging a *Brady* violation, where evidence is suppressed pre-trial and discovered post-trial, prejudice can be equated with whether the evidence was "material," and the test is often discussed with respect to whether "had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *See Kyles v. Whitley*, 514 U.S. 419, 433 (1995).  The Supreme Court has made clear, however, that the real question is whether the alleged suppression "prejudiced" the defendant.  *See Strickler v. Greene*, 527 U.S. 263, 282 (1999).  This distinction is critical here because there is no dispute that the United States was unaware of the calendar note until the day after the trial concluded.  ER 1282.

Accordingly, the question whether Sanchez was prejudiced by any suppression of evidence by the United States is not how the evidence would have been useful as impeachment if it hypothetically had been available at a trial that occurred before it was discovered. *See In re Masterson*, 638 Fed. Appx. 320, 327-28 (5th Cir. 2016) ("[Defendant] points to no authority for the proposition that a prosecutor has a duty to turn over subsequently discovered information about a witness related to events that had not yet occurred at the time of trial but would nevertheless, if a time machine were available, be useful to impeach the witness's credibility.") Instead, the question is whether the defendant suffered any prejudice from the alleged delay in disclosing the evidence after it was discovered. *See Smith v. Roberts*, 115 F.3d 818, 820 (10th Cir. 1997) ("Because the prosecution in this case did not obtain the evidence until after trial, the proceeding upon which the third element must focus is on the new trial motion, not the trial itself."). *Smith v. Roberts* provides a clear explanation of the difference.

In *Smith*, which came to the Tenth Circuit on habeas review, the defendant was convicted of aggravated indecent liberties with a child in violation of Kansas law, based primarily on the testimony of the victim and her mother. *Id.* at 819. After trial and sentencing, but while the conviction was on direct appeal, the state learned that both witnesses admitted that a neighbor had

also abused the victim, contradicting their trial testimony. *Id.* The court held that "because the State did not learn the testimony was false until after trial, prompt disclosure would only have allowed [the defendant] to move the state courts to consider it in a motion for new trial." *Id.* at 820. The court then considered "the delay in disclosure," which required the defendant "to use the information as the basis for a request for post-conviction relief" rather than a motion for retrial. *Id.* The court made clear that in analyzing the prejudice, or "materiality," prong of *Brady*, the "proceeding" at issue was the new trial motion, not the original trial. *Id.* The court concluded there was no prejudice because the denial of post-conviction relief, which is the functional equivalent of a hearing on a new trial motion, established that "the evidence was not material to the available post-trial proceedings." *Id.*

In this case, the district court found that the United States did not suppress evidence because Sanchez filed a timely motion for a new trial based on the calendar note. Sanchez disagrees with the district court, arguing that he is entitled to relief simply because the United States allegedly delayed turning over the phone evidence. The problem with that argument is that it ignores the law. To establish a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory or it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; **and**

prejudice must have ensued." *Strickler*, 527 U.S. at 281-82 (emphasis added).

Sanchez is entitled to relief only if he can establish prejudice.

Because the United States disclosed the evidence in time for Sanchez to

file a timely new trial motion, he cannot show any prejudice.   The district court

correctly found that the United States did not violate *Brady*.

### I.     B.   The district court, acting well within its discretion, denied Sanchez's motion for a new trial based on newly discovered evidence that was merely impeaching.

**Standard of review:**  The denial of a motion for a new trial based on

newly discovered evidence is reviewed for an abuse of discretion.  *United*

*States v. Hinkson*, 585 F.3d 1247, 1259 (9th Cir. 2009).

**Argument:**  In order to qualify for a new trial under Fed. R. Crim. P. 33

based on newly discovered evidence, Sanchez must demonstrate: "(1) the

evidence is newly discovered; (2) the defendant was diligent in seeking the

evidence; (3) the evidence is material to the issues at trial; (4) the evidence is

not (a) cumulative or (b) merely impeaching; and (5) the evidence indicates the

defendant would probably be acquitted in a new trial."  *United States v. Berry*,

624 F.3d 1031, 1042 (9th Cir. 2010) (internal quotation marks omitted).  A new

trial should only be granted "in exceptional cases in which the evidence

preponderates heavily against the verdict."  *United States v. Pimentel*, 654 F.2d

538, 545 (9th Cir. 1981).  And the newly discovered evidence must relate to the

elements of the offense charged.  *United States v. Hanoum*, 33 F.3d 1128, 1130 (9th Cir. 1994).

Sanchez's argument begins taking on water at step 3 in the analysis and sinks at steps 4 and 5.

With respect to materiality, although an argument can be made that J.T.F. authored the calendar notes, as found by the district court, "plenty of doubt exists that [J.T.F.] wrote the notes."  ER 27.  Both calendar notes were modified, making it impossible to know what they said when created.  *Id.*  And the iPhone was owned by at least seven different people in 2017 alone.  *Id.*  A finding that the evidence was material given the serious doubt as to its author was far from certain here.

But because the calendar note – if material at all – is relevant only for purposes of impeaching J.T.F., not whether Sanchez committed an element of the offense, Sanchez fails at step 4.  In finding that the calendar note was merely impeachment evidence insufficient to support a new trial, the district court concluded that the evidence had no exculpatory connection to Sanchez and "does not undermine critical evidence because [Sanchez's] conviction does not hinge on [J.T.F.'s] credibility."  ER 33.  The court correctly noted that the case against Sanchez was based on the testimony of four eyewitnesses, and "[J.T.F.'s] testimony was the least damning of the group."  *Id*.  Unlike the

testimony of other eyewitnesses, J.T.F. provided little information about what happened outside of the car because she was inside of the car and did not see who grabbed the gas can, poured the gas, or lit the fire. *Id*. The most she said was that Sanchez was outside of the car with Whiteman and Frank when the fire was lit. *Id.* As aptly described by the district court, impeachment of J.T.F. would have done nothing more than put a "slight dent" in the case against Sanchez. *Id*.

Although unnecessary given that the new evidence is merely impeaching, the district court considered whether a retrial would result in acquittal at step 5. Again, as noted above, the court found that it is far from certain a jury would find that J.T.F. wrote the calendar note. But, assuming that the jury would find J.T.F. wrote the calendar note and discredit her testimony entirely, the court noted that the testimony of all of the remaining eyewitnesses, Whiteman, Frank Sanchez, and S.F.B., was more than sufficient to support Dimarzio Sanchez's conviction. All three testified that Dimarzio Sanchez was outside the car when Jane was doused with gasoline and lit on fire. Whiteman and Frank Sanchez testified that Frank Sanchez handed Dimarzio Sanchez the gas can. Whiteman testified that Dimarzio Sanchez doused Jane with gasoline and lit her on fire. None of this damning testimony would be affected by discrediting J.T.F. In

short, discrediting J.T.F. would not make an acquittal on retrial more likely. *See Pimental*, 654 F.2d at 545.

Sanchez disagrees. He makes the counterintuitive argument that impeaching J.T.F. with the iPhone evidence would actually make the jury find her *more* credible because of the remorse and acknowledgement of culpability in the calendar note. App. Br. at 33. This twist then leads Sanchez down a spiral of speculative jury findings. *Id.* In the end, though, he still fails to explain how the calendar note that he assumes is written by J.T.F. exonerates him. Assuming Sanchez is right and J.T.F. wrote the note, she admits to helping find the gas can but not that she poured the gas and lit Jane on fire. The evidence presented at trial that Sanchez did those things remains intact. The theory of the government's case remains intact – Sanchez did not act alone, but he poured the gas and lit the fire. In sum, regardless whether the jury would find J.T.F. more culpable based upon the calendar note, it does not follow that the jury would find Sanchez less culpable.

Ultimately, this Court must examine the district court's decision under the abuse of discretion standard. Here, the district court did not make any factual findings that were illogical, implausible, or without the support of inferences that could be drawn from the facts in the record. Even discrediting J.T.F.'s testimony, there remains substantial evidence in the record to conclude

that Dimarzio Sanchez killed Jane.  The district court's decision to deny

Sanchez's motion for a new trial based upon newly discovered evidence should

be affirmed.

> **II.** **The district court properly denied Sanchez's motion to suppress because Sanchez did not unambiguously request an attorney; because he voluntarily, knowingly, and intelligently waived his *Miranda* rights; and because he had no Sixth Amendment right to counsel.**

 **Standard of review:**  This Court reviews the denial of a motion to

suppress *de novo*.  *United States v. Zapien*, 861 F.3d 971, 974 (9th Cir. 2017).

> **Argument:**

> **A.** **The district court properly concluded Sanchez's request for his tribal lay advocate was not an unambiguous request for an attorney.**

The Constitution requires that a person be advised of certain rights if they

are "in custody" and "subjected to interrogation."  *Miranda v. Arizona*, 384

U.S. 436, 467-68 (1966).  Under *Edwards v. Arizona*, 451 U.S. 477, 484-85

(1981), all questioning must cease upon the suspect's unambiguous request for

counsel.  If a suspect invokes his right to counsel, the court may admit his

responses to questions thereafter "only on a finding that [the suspect] (a)

initiated further discussions with the police, and (b) knowingly and intelligently

waived the right he had invoked."  *Id.*  To trigger the protections of *Edwards*, a

suspect must unambiguously and unequivocally request counsel.  *Davis v.*

*United States,* 512 U.S. 452, 459 (1994). The standard does not require that the suspect "speak with the discrimination of an Oxford don," rather it requires that a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.*

Here, Sanchez's question, "won't I get a lawyer," was not an unambiguous request for an attorney. Sanchez's "won't I get a lawyer," is strikingly similar to "maybe I should talk to a lawyer," and "I think I would like to talk to a lawyer," which were statements found by the United States Supreme Court and this Court, in *Davis* and *Clark*, respectively, to be ambiguous. In clarifying Sanchez's question, the agents soon learned that Sanchez was actually requesting the assistance of a tribal lay advocate, not an attorney. ER 116-18. Even after he was told that his tribal lay advocate was not an attorney, he still persisted in his request for his tribal lay advocate. ER 118. Although he did not unambiguously request the assistance of an attorney, the agents terminated the interview and honored Sanchez's request. ER 123. Sanchez then expressly waived his right to counsel in the presence of his tribal lay advocate and spoke to the agents. ER 125.

In this case, Sanchez received exactly what he asked for—an opportunity to speak with his tribal lay advocate. He did not unambiguously request the assistance of an attorney.

**B. The district court properly concluded Sanchez knowingly and intelligently waived his *Miranda* rights and voluntarily agreed to speak with law enforcement.**

A statement that is other than "the product of an essentially free and unconstrained choice by its maker . . . offends due process." *Doody v. Schiro*, 596 F.3d 620, 638 (9th Cir. 2010) (en banc) (quoting *Schneckloth v. Busta*mante, 412 U.S. 218, 226 (1973)); *accord Oregon v. Elstad*, 470 U.S. 298, 304–05, (1985). Whether a statement comports with due process, *i.e.*, is voluntary, hinges on "whether [the] defendant's will was overborne by the circumstances surrounding the giving of the confession." *Dickerson v. United States*, 530 U.S. 428, 434 (2000)); *Doody*, 596 F.3d at 638 (same); *accord United States v. Crawford*, 372 F.3d 1048, 1060 (9th Cir.2004) (en banc) ("[T]he question is whether the defendant's will was overborne [by either physical intimidation or psychological pressure] at the time he confessed.")

Although Sanchez does not explicitly challenge the voluntariness of his statements in this appeal, by accusing the agents of intentionally ignoring his request for an attorney, Sanchez essentially alleges that his statements were involuntary because they were the result of deceit – the agents knew when he

asked for the assistance of his tribal lay advocate that he was really asking for an attorney. By providing him with his tribal lay advocate and not an attorney, they deceived him rendering his statements involuntary.

Here, the district court correctly found that Sanchez's statements were voluntary because, prior to asking any questions, the agents told him he could stop the interview at any time and leave at any point. When Sanchez requested his tribal lay advocate, the agents stopped the interview, told him that his lay advocate was not a lawyer, and then located his advocate although they had no legal obligation to do so. The tribal lay advocate was either present or gave the agents permission to talk with Sanchez before they questioned him. Under the totality of these circumstances, Sanchez's will was not overborne by the agents and the statements he made were voluntary.

Again, although Sanchez does not explicitly claim that his waiver of rights was infirm, by suggesting that the agents intentionally ignored his request for an attorney, Sanchez implicitly calls into question his waiver of rights. The court correctly found that Sanchez's waiver of rights was knowingly and intelligently made. A waiver of rights is knowing and intelligent when made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). This Court considers several factors when making this

determination. *See United States v. Bautista-Avila*, 6 F.3d 1360, 1365 (9th Cir. 1993) (whether defendant signed a written waiver); *United States v. Bernard S.*, 795 F.2d 749, 752 (9th Cir. 1986) (age); *United States v. Gonzales*, 749 F.2d 1329, 1335-36 (9th Cir. 1984) (whether defendant appeared to understand his rights); *Derrick v. Peterson*, 924 F.2d 813, 824 (9th Cir. 1990) *overruled on other grounds by United States v. Preston*, 751 F.3d 1008, 1019-20 (whether defendant's rights were individually and repeatedly explained to him); and *United States v. Glover*, 596 F.2d 857, 865-66 (9th Cir. 1979) (whether defendant had prior experience with the criminal justice system).

Here, the court found that Sanchez's responses to the agents were articulate. ER 9. Sanchez read and signed a statement of rights before each interview. *Id*. And, again, prior to any questioning, he had the benefit of consulting with his tribal lay advocate. *Id*. Under the totality of the circumstances, Sanchez's waiver of his rights was knowingly and intelligently made. The district court should be affirmed.

## C. The district court properly concluded that Sanchez's Sixth Amendment right to counsel had not attached because a federal prosecution had not commenced.

This is simply a matter of timing. The Sixth Amendment right to counsel does not attach until a prosecution is commenced. *United States v. Charley*, 396 F.3d 1074, 1082 (9th Cir. 2005). Sanchez's Sixth Amendment right to

counsel had not attached prior to his April 2016 interview because he was in custody on an unrelated tribal charge. ER 2. Sanchez is wrong when he claims that his tribal arrest "evolved into the allegation that he unlawfully killed [Jane]." App. Br. at 25. As the bench warrant for the tribal case proves, Sanchez was arrested on a bench warrant issued on April 14, 2016, prior to the commission of the crime in this case. ER 1157. The bench warrant was for failure to appear for traffic offenses committed well before the crime at issue here. ER 1157-66. The criminal complaint, which alleged that Sanchez murdered Jane, was filed on June 20, 2016, two months after the interviews. ER 1418. Because no federal prosecution had commenced, on April 20, 2016, when Sanchez was interviewed, the district court properly found that Sanchez's Sixth Amendment right to counsel had not attached.

## III. The district court did not abuse its discretion by refusing to instruct the jury that Sanchez faced a mandatory minimum life sentence.

**Standard of Review:** This Court reviews a district court's decision whether to give supplemental instructions for an abuse of discretion. *Avila v. Los Angeles Police Dep't.*, 758 F.3d 1096, 1103-04 (9th Cir. 2014).

**Argument:** Sanchez argues that an instruction advising the jury that he faced a mandatory minimum life sentence if convicted was necessary to provide the jury with a complete explanation of the consequences of a guilty verdict and

that without the instruction the jury was misled.  App. Br. at 48.  He asserts a jury could have measured his culpability against Whiteman's and Frank's and determined a life sentence was unjust.  App. Br. at 48-49.

The district court correctly denied his request finding it contrary to settled law of the United States Supreme Court and this Court.  *See Shannon v. United States*, 512 U.S. 573, 579 (1994); *United States v. Olano*, 62 F.3d 1180, 1201 (9th Cir. 1995).  ER    In *Shannon*, the Supreme Court held that a jury "should be admonished to reach its verdict without regard to what sentence might be imposed."  *Shannon*, 512 U.S. at 579.  In *Olano*, this Court followed suit by holding that it is "inappropriate for a jury to consider or be informed of the consequences of their verdict."  *Olano*, 62 F.3d at 1201.  The district court did not abuse its discretion by denying Sanchez's request for a supplemental jury instruction.

**CONCLUSION**

This Court should affirm the district court's denials of Sanchez's motions for a new trial, to suppress statements, and for a supplemental jury instruction.

DATED this 30th day of September, 2019.

Respectfully submitted,

KURT ALME
United States Attorney

*/s/ Lori A. Harper Suek*

LORI A. HARPER SUEK
Assistant United States Attorney

## STATEMENT OF RELATED CASES

The government is not aware of any related cases.

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, I certify that the attached answering brief is proportionately spaced, has a typeface of 14 points or more, and the body of the argument contains 7,021 words.


DATED: September 30, 2019.

/s/ Lori A. Harper Suek

LORI A. HARPER SUEK
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I certify that on September 30, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Lori A. Harper Suek*
LORI A. HARPER SUEK
Assistant United States Attorney
